UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CORTEZ ROBINSON,

                            Plaintiff,

            v.                                                    Case No. 24-cv-789-pp

TAMI J. SCHULT,

                            Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 16) AND DISMISSING CASE

Plaintiff Cortez Robinson, who is incarcerated and is representing himself, is proceeding under 42 U.S.C. §1983 on an Eighth Amendment claim against an official at Racine Correctional Institution. The defendant has moved for summary judgment. Dkt. No. 16. The plaintiff opposes the motion. Dkt. No. 26. The defendant is entitled to judgment as a matter of law; the court will grant her motion and dismiss this case.

## I.    Facts

### A.    Procedural Background

On June 24, 2024, the court received the plaintiff's complaint asserting that the defendant, Racine Food Service Administrator Tami J. Schult, had violated his right to adequate food. Dkt. No. 1. The court screened the complaint and allowed the plaintiff to proceed on a claim under the Eighth Amendment. Dkt. No. 7.

On October 28, 2024, the court issued a scheduling order setting deadlines for the parties to complete discovery and file dispositive motions. Dkt. No. 11. On May 12, 2025, the defendant moved for an extension of the deadline to file dispositive motions on the merits. Dkt. No. 14. The court granted that motion and extended the deadline to May 21, 2025. Dkt. No. 15. At that deadline, the defendant filed her motion for summary judgment. Dkt. No. 16.

The next day—May 22, 2025—the court issued an order requiring the plaintiff to respond to the defendant's motion by June 20, 2025. Dkt. No. 22. The court gave the plaintiff instructions for responding to the defendant's brief and proposed findings of fact. Id. The court instructed the plaintiff that he "must respond to each of the defendant's proposed findings of fact (Dkt. No. 18), either by agreeing with the proposed fact or explaining why he disagrees with the proposed fact. . . . The plaintiff must support every disagreement with a proposed fact by citing to evidence." Id. at 1. The court explained that the plaintiff could support his disagreements "by relying on documents that he attaches to his response or by telling the court his version of what happened in an affidavit or an unsworn declaration under 28 U.S.C. §1746." Id. at 1–2.

On June 23, 2025, the court granted the plaintiff's motion for an extension of time and ordered him to file opposition materials by July 21, 2025. Dkt. No. 24. The plaintiff timely filed his opposition materials. Dkt. No. 25–27. The motion now is fully briefed and ready for the court's decision.

B.     Factual Background

The plaintiff responded to the defendant's proposed findings of fact and states that he disagrees with several of those facts. Dkt. No. 25. But he has not supported his disagreements by citing to evidence in the record, as the court instructed him to do in its May 22, 2025 order. See Dkt. No. 22 at 1. His response to the defendant's proposed facts is not signed, dated or verified as true under penalty of perjury, so the court will not treat it as an affidavit or an unsworn declaration. Because the plaintiff failed to comply with the court's order and has not supported his factual disagreements by citing to evidence in the record, the court will consider the defendant's proposed facts to be undisputed and admitted for purposes of this decision. See Civil Local Rules 56(b)(2)(B)(i), 56(b)(4) (E.D. Wis.); Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] failure to respond by the nonmovant as mandated by the local rules results in an admission.").

1.     *The Complaint*

In its August 23, 2024 screening order, the court recounted the allegations of the plaintiff's complaint:

> The plaintiff alleges that at around 5:00 to 5:45 p.m. on February 25, 2024, he was eating a chocolate bar that was served as part of his dinner. The plaintiff says he "noticed a sharp pain on the upper left side of [his] mouth" and noticed that his "teeth and gums were bleeding." He showed Sergeant Kennedy (not a defendant) what he "had found inside the chocolate bar," and Kennedy told the plaintiff to show Food Service. . . . The plaintiff says he had a "metal shaving stuck in [his] mouth" until the next morning, when he saw Dr. Yang (not a defendant) to remove the 1mm shaving. The plaintiff wrote to Schult about the incident, and she responded that "she was sorry for what had happened to [him] and the issue ha[d] been investi[g]ated and corrective action ha[d] been in place."

3

Dkt. No. 7 at 3–4 (internal citations omitted). The plaintiff attached exhibits to his complaint, including an incident report, pictures of the peanut butter bar and medical requests and grievances the plaintiff had filed afterward. Id. at 4. In the screening order, the court observed that some of those exhibits "add detail to the plaintiff's complaint." Id. For example, the incident report reflected that the plaintiff told Sergeant Kennedy

> that "he ate a piece and it felt like metal." Kennedy contacted kitchen staff and sent the plaintiff to show them the contaminated bar. Staff told Kennedy "there was something in there and they did not know what it was but they were sending [the plaintiff] back to the unit with some apples." . . . One of the plaintiff's open records requests notes that the metal was in the chocolate bar "from the constant scraping of the pan." The report from the plaintiff's dentist appointment notes that the metal shavings found in the bar "were tiny and glittering," and that he "could feel an object" between the plaintiff's teeth during the examination. Finally, the complaint report on the plaintiff's administrative complaint notes that Schult responded to an Interview/Information Request about the incident on February 28, 2024, stating, "At this time the issue has been investigated and corrective action has been in place. Thank you."

Id. at 4–5 (internal citations omitted).

The screening order explained that the plaintiff's allegations were limited to "one occasion in February 2024" when he claimed that he had eaten "contaminated chocolate bars that contained metal shavings, which cut his mouth and gums and caused him pain." Id. at 6. The court cited cases holding that "'[a] single instance of contaminated food is insufficient to state a claim of deliberate indifference.'" Id. at 7 (quoting Morris v. Buege, Case No. 23-cv-11-pp, 2023 WL 2465882, at *4 (E.D. Wis. Mar. 10, 2023), and citing others). The court also discussed Conley v. Schult, Case No. 24-cv-725-la, in which Judge

Adelman dismissed a complaint alleging nearly identical harm from the same incident on February 25, 2024. Id. at 7–8. Judge Adelman dismissed that complaint because the plaintiff had alleged nothing to suggest that "'this was a recurring issue or that prison officials were aware that the peanut butter bars were contaminated.'" Id. at 8 (quoting Conley, Dkt. No. 14 at 5). The screening order recounted that although in this case the plaintiff similarly "has not alleged a pattern of contaminated food," he did allege "that Schult 'knew from previous complaints about objects being found inside food' and failed 'to take heed and order new pans.'" Id. (quoting Dkt. No. 1 at 3–4). The court liberally construed the complaint to assert "that although the plaintiff was harmed while eating a contaminated bar on only one occasion, Schult had knowledge from previous complaints that the metal pans on which meals were served to incarcerated persons were problematic." Id. The court allowed the plaintiff to proceed on that basis under the Eighth Amendment. Id.

2.    *The Defendant's Proposed Facts*

a.    The Parties

The plaintiff was incarcerated at Racine during the events described in the complaint. Dkt. No. 18 at ¶1. Defendant Schult was an employee of the Wisconsin Department of Corrections (DOC) and worked as Food Service Administrator (FSA) at Racine between April 9, 2023 and June 3, 2024. Id. at ¶2. As FSA, the defendant was responsible for the planning, direction and operation of the food services department at Racine and another institution. Id. at ¶4. The food services department prepares, distributes and serves meals to

incarcerated persons. Id. at ¶5. The defendant also supervised food service staff and institutional workers, managed supplies and services and handled administrative tasks. Id. at ¶6.

The defendant says that she made several attempts to improve the food services department. Id. at ¶7. For example, she inspected the kitchen tools and equipment when she first began as FSA and submitted multiple requests for replacement tools and new equipment that she deemed necessary. Id. at ¶8; see Dkt. Nos. 20-1 and 20-2 (various requests for purchase and the defendant's reasons for requesting). The defendant asserts that despite her efforts, incarcerated persons still complained about the food at Racine, but she says that she immediately responded to these complaints and "took actions that were within the authority of [her] position to address the issue." Dkt. No. 20 at ¶7.

b.    The February 25, 2024 Incident

The defendant avers that on February 27, 2024, staff from the Health Services Unit called her to report several complaints of metal in the peanut butter bars that had been served two days earlier. Dkt. No. 18 at ¶15. She avers "that food service staff had made peanut butter bars without permission on that day," that she "had no prior knowledge" of the bars and that she "was not informed of this when it occurred." Dkt. No. 20 at ¶13. She cites a February 28, 2024 email that she sent to institutional staff about the bars, reiterating that "[s]taff didn't have permission to make these bars for this meal." Dkt. No. 20-3 at 1. The defendant stated that the ingredients were not

the likely cause of the metal pieces because other food items made with them had no issues. Id. She also asserts, "In the past we have had issues with this because when they cut the bar, the metal from the aluminum pans will come up into the dessert." Id. She asked whether Racine should "purchase all new pans" to correct the issue and stated that she had "verbally directed staff to not make peanut butter bars." Id.

On February 25, 2024, the day staff served the contaminated peanut butter bars, several incarcerated persons wrote Interview/Information Requests describing the presence of metal shavings in the bars. Dkt. No. 20-4 at 1–5. The plaintiff wrote one of these requests, asserting that the "chocolate bar" that he had received "had metal shaving at the bottom of it." Id. at 5. Four or five days later, the defendant responded to the requests about the bars, apologized that "this happened to" the affected incarcerated persons and stated that the food services department had taken "corrective action" to prevent the issue from happening again. Id. at 1–5.

The defendant explains that she did not work on February 25, 2024 (when the contaminated bars were made) because it was a Sunday, and she worked Monday through Friday. Dkt. No. 20 at ¶15. She says that food service staff are supposed to make and serve food in accordance with the approved, "As Served" menu. Id. at ¶16. She cites sections of the DOC's "Food Service Manual," which provides guidelines for "As Served" menus and food service at its institutions. Dkt. No. 19-3 at 19. The defendant avers that food service staff are expected to follow these menus, which "had to be planned and populated" from approved

menus "at least one week in advance of service." Dkt. No. 20 at ¶¶17–18.

"Emergency menu modifications" are allowed in exceptional circumstances, such as power outage, equipment failure, lockdown and other circumstances. Id. at ¶18. For February 25, 2024, Racine's approved menu included peanut butter *cookies* but not peanut butter *bars*. Id. at ¶20; Dkt. No. 19-4. The defendant avers that no emergency circumstances existed on February 25 to warrant the menu modification. Id. at ¶19. The plaintiff disagrees and insists that "policy allows for the menu to be changed without notice and due [to] product availability," but he cites nothing in support of this assertion. Dkt. No. 25 at ¶23.

The defendant avers that when she returned to work after February 25, 2024, she learned that food service staff had made and served the contaminated peanut butter bars. Dkt. No. 20 at ¶21. She reiterates that she believed that the metal shavings did not come from the ingredients, though she was not involved in making the bars. Id. at ¶22. The defendant concedes that during her years working in the food service department, she "had sporadically heard talks about unit servery inmate workers using metal spatulas on metal sheet pans that resulted in metal from the sheet pans coming up in the dessert." Dkt. No. 20 at ¶23. She cites the February 28, 2024 email in which she mentions this past issue. Id. (citing Dkt. No. 20-3 at 1). But she avers that she "had no personal involvement in these sporadic incidents" and "had not experienced this specific type of issues [*sic*] while [she] was the Food Service Administrator." Id. The plaintiff says that he and another incarcerated person

notified the defendant through Interview/Information Requests of a previous incident involving "metal coming up in the dessert (rice crispy treats)" served at Racine. Dkt. No. 25 at ¶28. But again, he cites nothing in support of this statement.

On February 29, 2024, the defendant inspected a peanut butter bar that was saved from the February 25 incident. Dkt. No. 18 at ¶30. She sent an email to other correctional staff about her observations. Dkt. No. 20-3 at 2. In that email, she stated that "it was very hard to see anything wrong with the bar," but that light shone on the bottom of the bar showed "small pieces of what looks like the size of glitter, or if you made a pencil mark on a piece of paper. The specks looked kind of gray/silver in color." Id. She avers that this observation, and her knowledge of the "sporadic incidents that [she] had heard in the past," led her to suspect that the metal shavings in the peanut butter bars came from staff "using metal object(s)" to cut the bars while they were on aluminum sheet pans. Dkt. No. 20 at ¶24. Alternatively, she thought that the shavings could have come from "pressing the mixture into sheet pans, as this could potentially result in metal shavings from the surface of sheet pans lifting and getting into the dessert bars." Id. The defendant was not able to confirm either of these theories, and the sheet pans used to make the contaminated bars had been cleaned by the time she returned to work after February 25. Id. at ¶25.

The defendant avers that she immediately directed food service staff not to make peanut butter bars or other dessert bars in the same way. Dkt. No. 18

at ¶35; Dkt. No. 20-3 at 3. This included brownies, butterscotch bars and rice crispy treats. Dkt. No. 18 at ¶35; Dkt. No. 20-3 at 3. She also instructed staff to go through the sheet pans used for food production and remove any that were damaged or required replacement. Dkt. No. 18 at ¶36. The defendant avers that three damaged pans remained at Racine after this incident "for further investigation." Dkt. No. 20 at ¶27. In March 2024, the defendant placed a request for 300 aluminum sheet pans for Racine. Dkt. No. 20-3 at 5–6. She says that she did not have the authority to replace cookware directly and required approval "from [her] supervisor and/or other relevant authority." Dkt. No. 20 at ¶28. The defendant avers that her last day working at Racine was April 4, 2024; she retired two months later, so she does not know what happened with the damaged pans or her requests for new pans. Id. at ¶¶2, 27, 28.

The defendant avers that during her time as FSA at Racine, the February 25, 2024 incident was "the first time [she] received food contamination complaints where the potential cause was linked to metal shavings from a sheet pan." Id. at ¶29. The plaintiff disagrees with this statement and reiterates his past complaint about rice crispy treats. Dkt. No. 25 at ¶39. But again, he cites no record evidence in support of this disagreement.

c.    Prior Complaints about Objects in Food

The defendant provided a list of administrative complaints related to food served at Racine filed by incarcerated persons between April 1, 2023 and June 30, 2024 (the time during which she served as FSA). Dkt. No. 19-1. She first

discusses an incident from June 24, 2023, in which an incarcerated person complained about a sharp object that he found in a slice of cake that he had eaten. Dkt. No. 18 at ¶10; Dkt. No. 19-2 at 1. The defendant investigated this incident and learned that the cake contained a piece of plastic "from either a juice cup or a milk cup." Dkt. No. 18 at ¶11; Dkt. No. 19-2 at 2. She ordered staff to dispose of the cake and says that "this was an isolated incident during [her] time as [FSA]." Dkt. No. 20 at ¶9.

The defendant then discusses other previous incidents of incarcerated persons finding a foreign object in their food. Dkt. No. 18 at ¶13. In November 2023, an incarcerated person complained about injuring his mouth on a small piece of broken-off can inside his peaches. Dkt. No. 19-2 at 11. The defendant sent a letter on November 21, 2023, apologizing for the incident and opining that the problem appeared to have come from the can opener and not from "the peaches themselves." Id. at 12. The defendant told the incarcerated person that "the can opener that is used on [his] housing unit has been replaced with a new can opener." Id. The defendant attached the requests for new can openers that she submitted after this incident. Dkt. No. 20-2 at 1, 3. She justified purchasing the new can openers by stating, "The brand of can opener we are currently using leaves shards of metal in the food." Id.

In December 2023, other incarcerated persons complained about metal pieces found in their lasagna. Dkt. No. 19-2 at 26–27, 40, 55. The defendant apologized to these incarcerated persons and assured them that the food services department was "making every effort to prevent this from happening."

Id. at 28, 42, 55. The defendant avers that these incidents are unrelated to the incident at issue in this case because these "prior incidents had to do with metal shavings from food cans/can openers or plastic object. They were unrelated to metal shavings potentially coming from a sheet pan." Dkt. No. 20 at ¶30.

### 3. *The Plaintiff's Declaration and Exhibits*

The plaintiff avers that since he arrived at Racine in November 2021, there have "been many incidents of food contamination whether be it rotten or spoiled food." Dkt. No. 27 at ¶5. The plaintiff states that he was injured from consuming the contaminated bars on February 25, 2024, and had to seek medical treatment. Id. at ¶¶7–8. He says that he asked the defendant to provide him the names of the cooks who made the bars and she refused. Id. at ¶9. He reiterates the defendant's statements from her declaration that as FSA, she "was responsible for the preparations[,] distribution and serving of meals" and "the supervision of food service staff and inmate workers." Id. at ¶¶14–15.

The plaintiff attached a copy of "Wis Adm 350.11 Job rules for DOC," which relate to Food Service. Id. at ¶10; Dkt. No. 27-1 at 25–26. But he does not cite any specific portion of this document or explain its relevance to his claim. He attached a copy of "DAI Policy and Procedures 500.60.11" related to "Food-Borne and Water-Borne Illness Outbreak." Dkt. No. 27 at ¶13; Dkt. No. 27-1 at 1–6. Again, however, he did not cite a specific portion of this document or explain its relevance.

The plaintiff cites an Interview/Information Request form from September 22, 2024 that he says relates to metal shavings in a dessert. Dkt. No. 27 at ¶11; Dkt. No. 27-1 at 30. He also attached a September 23, 2024 letter sent by Racine Security Director Brandon Morris that the plaintiff says is "about how metal got into brownies." Dkt. No. 27 at ¶12; Dkt. No. 27-1 at 27. The letter from Morris states "that the kitchen is aware of the issue and changes have been made. The shavings were due to PIOC [persons in our care] Kitchen workers overly using the kitchen tools causing scrapes to the pans which resulted in shavings being in the food items." Dkt. No. 27-1 at 27. This letter does not specify the food in which the shavings were found.

The plaintiff's exhibits also contain unidentified handwritten notes and emails between Racine staff. Id. at 7, 9, 33–36. The plaintiff does not cite these exhibits in his response materials and does not explain their relevance or significance. The court has not considered these exhibits for purposes of this decision. See Fed. R. Civ. P. 56(c)(3).

## II. Discussion

### A. Summary Judgment Standard

A party is entitled to summary judgment if he or she shows that there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a

13

"material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in his favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

B.    Eighth Amendment

As the court explained in the screening order, the Eighth Amendment protects against "deprivations of essential food" and "other conditions intolerable for prison confinement." Rhodes v. Chapman, 452 U.S. 337, 348 (1981). Prison officials have a duty to "ensure that inmates receive adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 834 (1994). A prison official "who fails to uphold these duties violates the Eighth Amendment upon exhibiting 'deliberate indifference to a substantial risk of serious harm to an inmate.'" Thomas v. Blackard, 2 F.4th 716, 719 (7th Cir. 2021) (quoting Farmer, 511 U.S. at 828).

To defeat the defendant's motion for summary judgment, the plaintiff must present evidence demonstrating that the deprivation he alleges is "objectively, 'sufficiently serious.'" Farmer, 511 U.S. at 834 (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). Only "extreme deprivations" amount to cruel

and unusual conditions of confinement. Giles v. Godinez, 914 F.3d 1040, 1051 (7th Cir. 2019) (citing Hudson v. McMillian, 503 U.S. 1, 9 (1992)). The plaintiff also must present evidence showing that Schult acted with "deliberate indifference" to a substantial risk that he would suffer serious harm. Farmer, 511 U.S. at 834. "[D]eliberate indifference means actual, personal knowledge of a serious risk, coupled with the lack of any reasonable response to it." Ayoubi v. Dart, 724 F. App'x 470, 474 (7th Cir. 2018) (citing Farmer, 511 U.S. at 837, 844–45). The prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [she] must also draw the inference." Farmer, 511 U.S. at 837. In other words, the plaintiff must show that Schult subjectively knew of but disregarded an excessive risk of harm to his health or safety. Id.; Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015).

C.    Analysis

The court explained in the screening order that the plaintiff's allegation "that on one occasion in February 2024, he was served contaminated chocolate bars that contained metal shavings" was insufficient to state a claim under the Eighth Amendment. Dkt. No. 7 at 6–7 (citing Morris, 2023 WL 2465882, at *4, and other cases). The court allowed the plaintiff to proceed on his claim because his allegations suggested "that although the plaintiff was harmed while eating a contaminated bar on only one occasion, Schult had knowledge from previous complaints that the metal pans on which meals were served to incarcerated persons were problematic." Id. at 8. The court clarified that at the

15

screening stage, it was accepting the allegations in the complaint as true "and liberally construing the complaint." Id. at 8; see id. at 3 (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); and Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017)) (explaining that at screening, the court accepts the facts alleged in the complaint as true and "construes liberally complaints filed by plaintiffs who are representing themselves").

The standard for summary judgment is different. "To defeat a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." Van Diest Supply Co. v. Shelby Cnty. State Bank, 425 F.3d 437, 439 (7th Cir. 2005) (quotation omitted). Although the plaintiff "provided sufficient *allegations* in his complaint to state an Eighth Amendment" claim, he must now "produce sufficient *evidence* to defeat defendant's summary judgment motion on that claim." Hoeft v. Kasten, 691 F. Supp. 2d 927, 931 (W.D. Wis.) (citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990)), aff'd, 393 F. App'x 394 (7th Cir. 2010)) (emphasis in the original).

As the court has explained, the plaintiff did not comply with the court's instructions (and the legal requirement) to respond to the defendant's proposed findings of fact by citing evidence in support of his disagreements with those proposed facts. The court has construed the defendant's facts as admitted and undisputed. See Civil L.R. 56(b)(2)(B)(i), 56(b)(4); Smith, 321 F.3d at 683. The question is whether the plaintiff nonetheless provided sufficient evidence to

prove the allegations in his complaint—that he suffered harm by eating a contaminated dessert bar on February 25, 2024, and that the defendant was personally aware of the risk that the plaintiff would consume a dessert bar with metal shavings in it but disregarded that risk.

It is undisputed that the plaintiff consumed a peanut butter bar on February 25, 2024 and was injured by a metal shaving that was on or inside the bar. The defendant asserts that she cannot be held liable for the plaintiff's injury because she had no knowledge of this issue occurring in the past and, even if she did, she was not personally involved in making the contaminated bars. Dkt. No. 17 at 7–12. The court will discuss each of these arguments.

        1.    *The defendant's Knowledge of Past Issues*

The defendant first discusses past complaints that incarcerated persons filed about other issues with food services at Racine. Dkt. No. 17 at 3–4. This includes instances of plastic in cake and metal in peaches and lasagna. The evidence shows that the defendant investigated these issues when they occurred and determined that they were caused by faulty equipment or preparation. The defendant requested new equipment and instructed kitchen staff on proper preparation of these foods. There is no evidence that any other incarcerated persons filed administrative complaints about foreign objects in their food during the defendant's time as FSA. Nor is there evidence that any incarcerated persons filed complaints about metal shavings in dessert bars before February 2025.

The defendant asserts that these institutional complaints about foreign objects in food at Racine "were distinctly different from the one at issue" in this case because they involved faulty can openers rather than aluminum pans or metal shavings. Id. at 8. The defendant appears to argue that because no other incarcerated persons filed a complaint about metal shavings in dessert bars before February 25, 2024, it did not occur. But just because other incarcerated persons did not submit formal administrative complaints about the issue with the aluminum pans before February 2024 does not mean it did not occur before then. The evidence that the defendant presents in this case shows that the plaintiff first complained about the February 25, 2024 incident by filing an Interview/Information Request form, rather than an administrative complaint. Although he eventually filed a formal complaint, the court knows from past cases that incarcerated persons do not always file formal complaints about incidents that occur at their institution. Even for those who do, their complaints may be rejected or returned and may not show up in the institution's complaint database. The lack of administrative complaints about metal shavings in desserts supports the defendant's claim that she did not have prior knowledge of that issue, but it does not *prove* that she lacked prior knowledge of the issue.

There is evidence suggesting that the defendant *did* have knowledge of past incidents where metal shavings were found in desserts. She admits in her declaration that she was aware before February 2024 of occasional instances at DOC institutions where incarcerated workers used metal spatulas on metal

sheet pans, which caused metal shavings to appear in the prepared desserts.
But she clarifies that she heard only unverified "talks" of this issue occurring,
that this issue never had occurred or been reported to her while she worked as
FSA at Racine and that the incidents were "sporadic" over her twenty-eight-year
career. Dkt. No. 20 at ¶23. In her brief in support of summary judgment, she
describes these past incidents as "only hearsay to her" because she had no
personal involvement in them. Dkt. No. 17 at 8.

The problem with the defendant's discussion of these past events is that
it contradicts what she said in her email to Racine staff on February 28, 2024,
after she returned to the institution and investigated the incident. In that
email, she wrote,

> On Sunday 2/25/24 staff made peanut butter bars instead of
> peanut butter cookies for the evening meal. Apparently there was an
> incident report stating that there were metal shavings in the peanut
> butter bars which caused said inmate to be ill. . . . In the past we
> have had issues with this because when they cut the bar, the metal
> from the aluminum pans will come up into the dessert.

Dkt. No. 20-3 at 1. The defendant did not say in this message that she "had
sporadically heard talks about" this issue occurring at *other* institutions, as
she says in her declaration. Dkt. No. 20 at ¶23. She said that in the past, "*we
have had* issues with this," and she even provided the cause of the shavings as
staff cutting the bars on the pans causing "the metal from the aluminum pans
[to] come up into the dessert." Dkt. No. 20-3 at 1. The defendant's use of the
term "we" suggests that she was referring to the food services department at
Racine, Racine in general or food services in general. Whichever she meant, this
language suggests that the defendant knew about the specific issue that the

19

plaintiff alleges in this case—metal shavings in desserts prepared on aluminum pans—rather than knowing about only the "distinctly different" concerns raised in other administrative complaints about can openers or plastic pieces.

The Eighth Amendment requires prison officials to take reasonable steps to address substantial risks of serious harm to incarcerated persons of which they are aware. <u>Farmer</u>, 511 U.S. at 832, 837. A reasonable jury could view the defendant's statement in the February 28 email as a confession that she knew about the issue of metal shavings coming up into desserts prepared and/or served on aluminum pans sometime before it occurred at Racine on February 25, 2024, but failed to take reasonable steps to prevent it from happening again.

The plaintiff attempts to bolster this conclusion with additional evidence. He first insists that the defendant was aware of the problem with the aluminum pans being scraped and generating metal shavings in desserts because he and another incarcerated person complained about that issue months before February 25, 2024, when rice crispy treats had metal shavings in them. But the plaintiff discusses this alleged past incident only in his response to the defendant's proposed facts. Dkt. No. 25 at ¶28. He did not provide copies of the past request forms that he says he filed about the rice crispy treats. Nor does he mention this past incident in his declaration, which is signed, dated and sworn to be true under penalty of perjury. Dkt. No. 27 at 4. As the court has explained, the plaintiff's response to the defendant's facts is unsigned, undated and unsworn. That means it is not admissible evidence on

which the court may rely in deciding the defendant's motion. See Sellers v. Henman, 41 F.3d 1100, 1101 (7th Cir. 1994) (noting that "unsigned and hence unsworn" statement does not comply with Rule 56); Zavala-Alvarez v. Darbar Mgmt., Inc., 617 F. Supp. 3d 870, 886 (N.D. Ill. 2022) ("An unsworn statement that lacks a certification under penalty of perjury has no evidentiary value . . . From an evidentiary standpoint, it's weightless.").

The plaintiff also submitted documents showing that in September 2024, other incarcerated persons complained about metal shavings in brownies at Racine. Dkt. No. 27-1 at 27, 30. Racine staff surmised that the problem was caused by kitchen workers scraping pans with kitchen tools—the same purported cause of the shavings in the peanut butter bars on February 25, 2024. But September 2024 was five months *after* the defendant left Racine and three months *after* she had retired. That incarcerated persons continued to complain about metal shavings in desserts suggests that the defendant's supervisors did not purchase the new pans that she requested in March 2024. But it is not evidence that the defendant knew *before* February 2024 that there were potential issues with the pans.

The plaintiff has not produced any additional evidence suggesting that the defendant knew the metal pans at Racine were problematic and could cause metal shavings to appear in items prepared on those pans. But the defendant's own evidence would be sufficient to support a finding that she knew about this issue before February 25, 2024 and failed to take reasonable

action to prevent it from happening again. The defendant is not entitled to summary judgment on this basis.

### 2. *Personal Involvement*

The defendant also asserts that she is entitled to summary judgment on the plaintiff's Eighth Amendment claim because there is no evidence that she was personally involved in the February 25, 2024 incident. Dkt. No. 17 at 7–9. The defendant relies on the defendant's position as FSA and asserts that she "cannot be held liable for staying within [her] job responsibilities and relying on other employees to do their jobs." Id. (citing Burks v. Raemisch, 555 F.3d 592, 596 (7th Cir. 2009)). The defendant contends that she is not responsible "for the food service staff's decision to make peanut butter bars—a deviation from the approved menu—without her knowledge and during her day off." Id. at 7–8.

The plaintiff concedes that the defendant "could not predict that the food service staff would make and serve a food item that was not on the approved menu for [F]ebruary 25, 2024." Dkt. No. 26 at 5. But he counters that she "was aware of the variations allowed due to the availability of items and the fact that menu's [*sic*] are subject to change without notice." Id. The plaintiff says that the defendant should be held liable because she was responsible for supervising kitchen staff and because of "her failure to act on information indicating unconstitutional acts." Id. at 4.

As the defendant correctly points out, "'[s]ection 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a

constitutional violation.'" <u>Hildebrant v. Ill. Dep't of Nat. Res.</u>, 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting <u>Vance v. Peters</u>, 97 F.3d 987, 991 (7th Cir. 1996)). Section 1983 does not provide for supervisory liability for subordinates' actions "under a theory of *respondeat superior*." <u>See</u> <u>Iqbal</u>, 556 U.S. at 676. "Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." <u>Burks</u>, 555 F.3d at 594. Supervisory staff cannot be held liable for the past conduct of their subordinates because "after the conduct at issue is completed, there is nothing the official can do to stop it." <u>Phillips v. Mega Concrete Constr., LLC</u>, Case No. 20-CV-658, 2022 WL 252100, at *8 (W.D. Wis. Jan. 27, 2022) (citations omitted). A supervisor may be liable for her subordinates' actions only if there is evidence that she knew about the conduct ahead of time and facilitated, approved or condoned it. <u>Kemp v. Fulton County</u>, 27 F.4th 491, 498 (7th Cir. 2022).

The undisputed evidence does not support a finding that the defendant knew that kitchen staff would make and serve the peanut butter bars on February 25, 2024, or that she was personally involved in making or serving the bars. It is undisputed that the defendant was not working that day, which was a Sunday and her day off. The evidence shows that kitchen staff who were working that day did not have permission to make the bars, which were not on the approved menu for February 25. The menu called for staff to make and serve peanut butter cookies. It is undisputed that there was no reason for staff to deviate from the approved menu and make the bars instead of the cookies. Nor is there evidence that anyone informed the defendant of the kitchen staff's

23

decision to make peanut butter bars instead of cookies or that the defendant otherwise knew until she returned to work later that week that staff had made the bars. Although the defendant was the FSA on February 25 and she supervised kitchen staff as part of her job duties, she cannot be held liable for their actions on that basis alone.

The plaintiff asserts that the defendant should be held liable for kitchen staff's decision to make the peanut butter bars because she knew that food menus at Racine were subject to change based on the availability of items. He also says that the defendant had "information indicating unconstitutional acts," but he does not say what this information was or cite any evidence in support of this vague statement. There is *no evidence* showing that the defendant knew in advance that kitchen staff would prepare the peanut butter bars in place of the cookies that were on the approved menu for February 25. Nor is there any evidence suggesting that item availability affected the decision to make bars instead of cookies. The defendant was entitled to expect that in her absence, kitchen staff would do their jobs properly and prepare the food on the approved menu. She cannot be held liable for not anticipating that kitchen staff would deviate from the menu and make peanut butter bars instead of peanut butter cookies. See Stankowski v. Carr, Case No. 23-2458, 2024 WL 548035, at *2 (7th Cir. Feb. 12, 2024) (citing Horshaw v. Casper, 910 F.3d 1027, 1029–30 (7th Cir. 2018)) ("[S]upervisors cannot be held responsible for the actions of subordinates or for failing to ensure that subordinates carry out their jobs correctly"). Because there is no evidence showing that the defendant

knew ahead of time and approved the decision to make the bars or that she herself made or served the bars, she cannot be held liable for the harm that the bars caused the plaintiff.

### 3. *Alternative Grounds*

For the first time in his response brief, the plaintiff cites provisions of DOC institutional policy and the Wisconsin Administrative Code to support his claim that the defendant violated his constitutional rights. Dkt. No. 26 at 1–2. But the plaintiff did not discuss these policies or codes in his complaint, and he does not explain how these policies or laws are relevant to his claim. Even if he had, a violation of prison policies or state law does not establish a constitutional violation. See Hunter v. Mueske, 73 F.4th 561, 567 & n.1 (7th Cir. 2023); Pulera v. Sarzant, 966 F.3d 540, 551 (7th Cir. 2020).

## III. Conclusion

The undisputed evidence would allow a reasonable jury to find that the defendant knew from past incidents that the metal pans used at Racine "were problematic" and could cause metal shavings to appear in or on dessert bars prepared or served on those pans. But there is no evidence from which a reasonable jury could conclude that the defendant personally made or served the peanut butter bars on February 25, 2024, or that she knew about and approved the decision to make the bars. Because the evidence does not support a finding that the defendant personally was involved in the conduct that caused the plaintiff's injury, she cannot be held liable for that injury under §1983. The

defendant is entitled to judgment as a matter of law on the plaintiff's Eighth Amendment claim.[1]

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 16.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **thirty days** of the entry of judgment. See Fed. R. App. Pro. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. Pro. 4(a)(5)(A). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion in *this court*. See Fed. R. App. P. 24(a)(1). The Court of Appeals may assess the plaintiff a "strike" if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in federal court (except a petition for *habeas*

---

[1] Because the court is granting summary judgment to the defendant on the merits, she "does not need qualified immunity.'" Sierra-Lopez v. County, Case No. 17-cv-1222, 2019 WL 3501540, at *10 (E.D. Wis. July 31, 2019) (quoting Viero v. Bufano, 925 F. Supp. 1374, 1387 (N.D. Ill. 1996); and Antepenko v. Domrois, Case No. 17-cv-1211, 2018 WL 6065347, at *6 (E.D. Wis. Nov. 20, 2018)).

*corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **twenty-eight days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 26th day of August, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**